IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISTRICT COUNCIL NO 16 OF THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, GLAZIERS, ARCHITECTURAL METAL & GLASS WORKERS, LOCAL 1621<br><br>  Petitioner<br><br>  v<br><br>B & B GLASS, INC<br><br>  Respondent. | No  C-04-1219 VRW<br><br>ORDER |

Petitioner (Union 1621) has filed a petition to compel arbitration pursuant to 9 USC § 4. Doc #1 (Petition). Respondent, appearing specially, moves the court to dismiss the petition for lack of personal jurisdiction pursuant to FRCP 12(b)(2). Doc #22. The court heard oral argument on the issue on May 19, 2005. Based upon the parties' arguments and the applicable federal law, the court GRANTS respondent's motion.

//

**I**

The following facts are not in dispute. B&B Glass, Incorporated (BBAZ), an Arizona corporation, was formed in 1978 and performs glass and glazing work for construction projects. Although the majority of BBAZ's business has been conducted in Arizona, the company has taken projects in New Mexico, Utah and California. In 1995, Bryan Buckholz was the sole shareholder in BBAZ after purchasing the stock from his parents and siblings. In late 1995, BBAZ began work on three small projects in Texas.

In 1998, Buckholz formed another corporation, B&B Glass, Inc, as a separate entity incorporated under the laws of Texas (BBTX). BBTX is the respondent in this case. Although Buckholz was the sole shareholder in BBTX, he hired Rick Churchill (a Texas resident) as the full-time project manager. Buckholz devoted all of his time to BBAZ and Churchill to BBTX.

In 1999, John Collier bought a 21% interest in both BBAZ and BBTX with Buckholz retaining the balance. By April 2003, Buckholz sold his entire interest in BBTX to Collier, Churchill and Bernie Hageman, each holding a 1/3 interest. At the same time, Hageman and Churchill became shareholders of BBAZ and, along with Churchill and Buckholz, each of the four held a 25% interest in BBAZ. In December 2004, Churchill became the sole shareholder of BBTX, selling his shares in BBAZ.

In March 2002, Churchill, on behalf of BBTX, entered into a collective bargaining agreement (Texas CBA) with the Painters and Glaziers Local Union No 53 (Union 53) of the International Union of Painters and Allied Trades in the Dallas, Texas metropolitan area. The CBA was enforceable through February 28, 2004.

Also important to the current motion, in July 2002, Union 1621 entered in to a CBA (California CBA) with various employers in fourteen northern California counties, including Santa Clara. The California CBA is enforceable through June 30, 2005. In July 2003, BBAZ began work at the San Jose State University Housing Project in California.

In March 2004, a dispute arose between Union 1621 and BBAZ regarding the applicability of the California CBA to BBAZ's work with San Jose State. Under the terms of the California CBA, any dispute between parties to the agreement is to be resolved through a grievance procedure, the final step of which is binding arbitration.

On March 26, 2004, Union 1621 filed a petition to compel arbitration of the dispute in the Northern District of California. Doc #1. Union 1621 seeks to compel BBTX (not BBAZ) to arbitrate the dispute whether the California CBA applies to BBAZ's work in San Jose. The record does not reflect whether BBAZ is a signatory to the California CBA, but it is clear that BBTX is not a signatory.

In response, BBTX filed a motion to dismiss the petition pursuant to FRCP 12(b)(2), arguing that this court lacks personal jurisdiction over BBTX. Doc #22. BBTX's memorandum in support of its motion argues (in depth) that (1) the court does not have general jurisdiction over BBTX, (2) the court does not have specific jurisdiction over BBTX, (3) there is no parent/subsidiary relationship between BBTX and BBAZ sufficient to establish personal jurisdiction and (4) BBAZ is not the alter ego of BBTX so as to confer personal jurisdiction over BBTX.

3

In its opposition, Union 1621 begins by stating that BBTX "has presented this Court with 25 pages of legal irrelevancies. The simple truth is that [BBTX] <u>consented</u> to the jurisdiction of this Court when it signed the [Texas CBA] with [Union 53]." Doc # 37 at 1 (emphasis in original). Hence, Union 1621 does not argue that (1) BBTX has the requisite minimum contacts with California or that (2) BBTX is the alter ego of BBAZ. Union 1621 bases its argument for this court's jurisdiction on BBTX's purported "consent," which it manifested by signing the Texas CBA and agreeing to submit disputes to arbitration "wherever it [BBTX] does covered work." Doc #37 at 1. Moreover, according to Union 1621, as BBTX's shareholders jointly owned 75% of BBAZ when BBAZ began the San Jose State project, the Texas CBA applied to BBAZ's work at San Jose State. Id.

## II

### A

"The question of arbitrability -- whether the parties are to be compelled to arbitrate -- is ultimately decided by the court, not the arbitrator, on the basis of the contract entered into by the parties." <u>McKinstry Co v Sheet Metal Worker's Int'l Association, Local Union No 16</u>, 859 F2d 1382, 1385 (9th Cir 1988) (citing <u>AT&T Technologies v Communications Workers</u>, 475 US 643, 649 (1986)). "The district court should independently review the agreement. * * * [The court must] exercise plenary review to determine whether the matter is arbitrable." Id.

Before determining arbitrability, the court must "first determine whether it has personal jurisdiction over the parties."

*Washington Square Securities v Sowers*, 218 F Supp 2d 1108, 1111 (D Minn 2002) (citing *Wessels, Arnold & Henderson v Nat'l Medical Waste, Inc*, 65 F3d 1427, 1431 (8th Cir 1995)).  "[T]he party asserting [personal] jurisdiction has the burden of establishing its existence when challenged." *Amba Marketing Systems, Inc v Jobar Int'l, Inc*, 551 F2d 784, 787 (9th Cir 1977) (citation omitted).  "When a court's personal jurisdiction is properly challenged by motion under [FRCP] 12(b)(2), the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Laboratories, Inc v Akzo*, 2 F3d 56, 59-60 (1st Cir 1993).

   The present case, however, presents a situation in which the issues of personal jurisdiction and arbitrability are inseparable.  As mentioned above, Union 1621's sole argument for personal jurisdiction over BBTX is BBTX's consent to arbitrate the present dispute in this forum.  Accordingly, to determine whether this court has personal jurisdiction over BBTX, the court will necessarily have to determine the question of arbitrability (i e, whether BBTX consented to arbitration).

### III

   BBTX entered into the Texas CBA with Union 53 regarding work done in the Dallas metropolitan area.  Union 1621 first directs the court to Article XVIII, § 5 of the Texas CBA.  Section 5 provides, in relevant part, that:

> The Employer party [BBTX] shall, when engaged in work outside the geographic jurisdiction [Dallas, Texas] of the Union party to this agreement [Union 53], comply

5

> with all of the lawful clauses of the [CBA] in effect in said other geographic jurisdiction and executed by the employers of the industry and affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits and procedure for settlement of grievances set forth therein.
>
> This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable [CBA] and through the courts.

Doc #38 (Davis Decl), Ex 3 at 24 (emphasis added).

The language of § 5 appears to be straightforward and the parties do not seem to disagree about its meaning: If BBTX physically engages in work outside of the Dallas metropolitan area (e g, San Jose, California), BBTX must comply with all of the clauses of the CBA in effect in San Jose between San Jose glass and glazing employers and the affiliated local union (e g, Union 1612). Moreover, if BBTX failed to comply with the local union's CBA, the union could enforce the provisions of the CBA (including binding arbitration) in California and need not bring an action in Texas. CBA provisions like § 5, commonly referred to as "out of area" clauses, are enforceable in the Ninth Circuit. <u>McKinstry</u>, 859 F2d at 1385-87.

But BBTX engaged in no work at San Jose State; only BBAZ did so. Section 5 alone is, therefore, insufficient to establish personal jurisdiction in California over BBTX. Union 1621 relies on § 1 of Article XVIII.

Section 1, provides, in pertinent part, that:

> To protect and preserve, for the employees covered by this Agreement [Texas CBA], all work they [Union 53 members] have performed, and to prevent any device or subterfuge to avoid protection and preservation of such work, it is agreed as follows: If the Employer [BBTX] performs on-site construction work * * * under

6

>           its own name or the name of another corporation * *
>           * wherein the Employer [BBTX], through its officers,
>           directors, owners or stockholders, exercises directly
>           or indirectly * * * Management Control or majority
>           ownership, the terms and conditions of this Agreement
>           shall be applicable to all such work.

Doc #38, Ex 3 at 22 (emphasis added).

Section 1 is commonly referred to as a "anti-dual-shop clause." See <u>Northeast Ohio District Council of the United Brotherhood of Carpenters and Joiners of America</u>, 310 NLRB 1023 (1993). Union 1621 reads § 1 in tandem with § 5 to provide that § 5 applies not only to BBTX's out-of-area work, but also to the out-of-area work of entities over which BBTX exercises management control or majority ownership. See Doc #37 at 6 (stating that without § 1, BBTX would "be permitted to avoid its responsibilities * * * by creating new business entities to do its projects outside the Dallas, Texas area -- although this is <u>exactly</u> the scenario [§ 1] was designed * * * to prevent.") (emphasis in original). Under this interpretation, BBTX is prevented from escaping its contractual obligations under § 5 by forming a sham corporation that BBTX directly or indirectly owns, to do out-of-area work. According to Union 1621, because the shareholders of BBTX owned 75% of BBAZ stock, the shareholders of BBTX exercise majority ownership over BBAZ within the meaning of § 1, and thus the Texas CBA (including § 5) is binding on BBAZ. This argument fails to persuade; the present situation is not "exactly the scenario § 1 was designed to prevent."

First, the language of § 1 demonstrates that this provision is only applicable if BBTX is doing work under the name of another entity <u>within the Dallas metropolitan area</u>. Section 1

7

states that the purpose of the provision is to "protect and preserve, for the employees <u>covered by this Agreement</u>, all work <u>they</u> have performed." Doc #38, Ex 3 at 22 (emphasis added). The only employees that are covered by the Texas CBA are the union members of Union 53, the union signatory to the Texas CBA. Interpreting § 1 as limited only to work done by BBTX in the Dallas area finds support in the case law:

> An anti dual-shop-clause is a clause that seeks to protect the employees in a bargaining unit from the effects of "double-breasting," a phenomenon that is common in the construction industry. "Double-breasting" generally refers to a union employer's acquisition, formation or maintenance of a separate nonunion company to perform the same type of work <u>in the same geographic area</u> as covered by its union agreement.

<u>Painters and Allied Traders District Council No 51 and Manganaro Corp</u>, 321 NLRB 158, 158 (1996) (emphasis added). Additionally, the language of § 2 of Article XVIII supports this limited interpretation of § 1. Section 2, the provision through which § 1 is enforced, reads, in pertinent part:

> All charges of violations of Section 1 of this Article shall be considered a dispute and shall be processed in accordance <u>with the provisions of this Agreement on the handling of grievances</u>.
> Doc #38, Ex 3 at 22 (emphasis added).

Hence, any disputes concerning § 1 are governed by the grievance procedures of the Texas CBA, not a foreign CBA. This language belies Union 1621's assertion that it can enforce § 1 against BBAZ under the grievance procedures of the California CBA. Accordingly, the court concludes that § 1 does not apply extraterritorially.

Next, even assuming § 1 applies extraterritorially, the court concludes that § 1 is not applicable to BBAZ's work done at San Jose State. As the parties informed the court at oral

8

argument, § 1 is referred to as "Manganaro language" based upon the National Labor Relations Board (NLRB) case that first analyzed an anti-dual-shop clause containing the language used in § 1.  See Manganaro, 321 NLRB 158.  In Manganaro, a proposed CBA between Manganaro Corporation and Union 51 contained an anti-dual-shop clause which, for all practical purposes, was identical to § 1 of the Texas CBA.  Id at 161-62.  Manganaro Corporation brought suit alleging that the clause violated (among other things) § 8(e) of the National Labor Relations Act (NLRA), 29 USC § 158(e).  Id.

"Section 8(e) of the [NLRA] generally prohibits those collective-bargaining agreements which require employers to cease doing business with any other person."  Id at 163 (emphasis added). Section 8(e) is qualified, however, because the NLRA does not prohibit a CBA provision, no matter how "severe the impact * * * on neutral employers," so long as the primary objective of the provision is the "preservation of work for [] employees" covered under the agreement.  Nat'l Woodwork Manufacturers Ass'n v NLRB, 386 US 612, 626, 644 (1967).

Thus, a CBA provision will not be unenforceable if its "primary objective" is the preservation of work for union members. If, however, a CBA provision requires employers to cease doing business with other employers and the provision is "tactically calculated to satisfy union objectives" other than work preservation, § 8(e) is violated.  Id at 644.  Such a provision is deemed to have only the "secondary objective" of preserving work for union members, and "Congress intended [the NLRA] to reach only agreements with secondary objectives."  NLRB v Int'l Longshoremen's Ass'n, 447 US 490, 504 (1980) (hereinafter ILA).

9

In <u>ILA</u>, the Court announced a two-prong test to determine whether a CBA provision constitutes a lawful work preservation agreement: "First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question -- the so-called 'right of control' test." Id at 504. "The rationale of the second test is that if the contracting employer has no power to assign [or control] the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work." Id at 505 (citing <u>NLRB v Pipefitters</u>, 429 US 507, 517 (1977)).

Applying the <u>ILA</u> test, the NLRB concluded that the anti-dual-shop clause at issue in <u>Manganaro</u> was a valid work preservation provision. <u>Manganaro</u>, 321 NLRB at 164. The only portion of Manganaro that is relevant to the current motion is the NLRB's analysis of the anti-dual-shop clause under the "right of control" test. Manganaro argued that the clause did not pass the right of control test because "it could and would apply to separate, though commonly owned, companies over which the signatory has no power to assign work." Id. The NLRB, however, did not interpret the clause this broadly:

> We [hold] that the requirement that the signatory contractor exercise 'management, control or majority ownership' over another entity presumptively means the contractor has the right or the power to control the assignment of work of that entity's employees. In addition, the clause by its terms states that it applies only if the signatory 'exercises' such control. This is more than potential authority; it refers to the actual or active control of the work. * * *. Thus, we disagree with [Maganaro] and find that the language

10

> of <u>the clause applies only when the signatory contractor has the right of control over the work in question</u>. * * *.
> [The] clause applies to the <u>signatory contractor</u> who <u>performs</u> and <u>exercises</u> control over the work, not to tangential ownership or management.
> Id at 164-65 (second emphases in original).

The court finds the reasoning of <u>Manganaro</u> persuasive. Accordingly, assuming § 1 has extraterritorial effect, it only applies when BBTX (1) actually performs the on-site construction work or (2) exercises <u>actual</u> <u>control</u> over the entity which is performing the work.

Interpreting § 1 as applying simply because BBTX and BBAZ have common shareholders, as Union 1621 urges the court to do, would render § 1 a unenforceable secondary obligation provision under Supreme Court precedent interpreting the NLRA.  Rather, Union 1621 was required to come forward with evidence to demonstrate, by a preponderance of the evidence, that BBTX exercises <u>actual</u> <u>control</u> over BBAZ's work at San Jose State.  The Union has introduced no evidence on this point, much less evidence sufficient to meet a preponderance standard.  Nor could Union 1621 present such evidence; it is clear that, in April 2003, BBTX and its shareholders exercised no control over the work conducted by BBAZ. BBAZ's work was controlled entirely by Buckholz.

### III

In sum, the court concludes that § 1 is geographically limited to the Dallas metropolitan area.  Moreover, assuming § 1 applies extraterritorially, the provision is not applicable merely because BBTX and BBAZ have common shareholders; the NLRA requires more before anti-dual-shop provisions such as § 1 can be invoked.

11

Union 1621 has failed to demonstrate the required "control" necessary to invoke § 1.

Without § 1 providing the necessary "extra layer" (as Union 1621 counsel called it at oral argument) between BBAZ and BBTX, § 5 is insufficient to grant this court personal jurisdiction over BBTX.  BBTX's motion to dismiss is GRANTED (Doc #22).  The clerk is directed to CLOSE the file and TERMINATE all motions.

IT IS SO ORDERED.



VAUGHN R WALKER

United States District Chief Judge